IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

RJB PROPERTIES, INC.,                          )
                                               )
                    Plaintiff,                 )
                                               )
        v.                                     )        No.  04 C 5226
                                               )
BOARD OF EDUCATION                             )        Judge Robert W. Gettleman
OF THE CITY OF CHICAGO,                        )
                                               )
                    Defendant.                 )

## MEMORANDUM OPINION AND ORDER

Plaintiff RJB Properties, Inc. ("RJB") filed a three-count second amended complaint
seeking damages and injunctive relief against defendant the Board of Education of the City of
Chicago ("Board").  Count I asserts that defendant deprived plaintiff of its liberty interest in
being considered for contracts with defendant without due process, in violation of the Fifth and
Fourteenth Amendments.  Count II seeks, in the alternative, for a declaration that two requests
for proposals ("RFPs") for janitorial work issued by defendant were not "professional services"
and therefore not subject to the professional services exemption of the competitive bidding
statute.  Count III asserts that defendant violated plaintiff's equal protection rights by its "wholly
arbitrary act" of refusing to award contracts under the RFPs to plaintiff, in violation of the Fifth
and Fourteenth Amendments.

The parties have filed cross motions for summary judgment under Fed. R. Civ. P. 56.
Defendant has also filed a motion to strike the affidavit of Ronald Blackstone ("Blackstone"),
plaintiff's president, and to strike portions of plaintiff's L.R. 56.1 statement that rely on
Blackstone's affidavit.  For the reasons stated below, the court grants defendant's motion for

summary judgment as to Counts I and III, and grants plaintiff's motion for summary judgment as to Count II. The court denies as moot defendant's motions to strike.

<h1 style="text-align:center">FACTS[1]</h1>

## I.     Violations of Local Rule 56.1

The court notes that the parties improperly failed to include a statement of facts in their opening briefs; instead, each asks the court to refer to its lengthy L.R. 56.1 statement. See Duchossois Indus., Inc. v. Crawford & Co., 2001 WL 59031, at *1 (N.D.Ill. Jan. 19, 2001) (L.R. 56.1 statements are not substitutes for a statement of fact section in a brief). It appears that both parties have improperly used this device to avoid the fifteen page limitation of L.R. 7.1. Moreover, the parties confuse the distinct purposes of L.R. 56.1 statements and a statement of facts in a brief. While the former may not be argumentative, the latter may. In the instant case, each party inserts copious and redundant argument in its L.R. 56.1 statement, which accomplishes nothing more than precluding an admission on any point by opposing counsel, and further compounds the violations of the spirit and the letter of L.R. 56.1. In addition, defendant failed to attach side-tabs or otherwise separate its exhibits and does not provide an index, in violation of this court's standing order, not to mention common sense.

Defendant asks the court to strike certain portions of plaintiff's statement of facts because they are based on Blackstone's affidavit. The court agrees with defendant that some of Blackstone's testimony contains impermissible legal conclusions, and that several of plaintiff's L.R. 56.1 statements contain unresponsive additional facts and legal arguments in violation of

---

[1]Unless otherwise noted, the following facts, taken from the parties' L.R. 56.1 statements and attached exhibits, are not in dispute.

L.R. 56.1. Defendant's L.R. 56.1 statement, however, also contains legal conclusions and extraneous facts. Rather than provide a full written exegesis of the challenged L.R. 56.1 statements and supporting affidavits, in which both parties seek improperly and at great length to argue the merits, the court disregards statements based on improper affidavit testimony or otherwise violative of L.R. 56.1. See Ogborn v. United Food and Commercial Workers, Local No. 881, 2000 WL 1409855, at *3 (N.D.Ill. Sep. 25, 2000) ("to the extent any factual assertion has been inadequately or improperly supported, such assertions will not be incorporated into the facts taken to be true for purposes of [summary judgment]").

## II.    Facts established from the record

Defendant is the governing body of the Chicago Public Schools and has final policymaking authority. Sean Murphy ("Murphy") was defendant's chief purchasing officer ("CPO") from December 2002 to August 2003, when he became chief operating officer. Heather A. Obora ("Obara") became defendant's CPO after Murphy was transferred. Plaintiff RJB is an Illinois corporation with a principal place of business in Orland Park, Illinois. Ronald Blackstone ("Blackstone") is the owner of RJB. Defendant Board is an Illinois body politic and corporate. RJB is a minority-owned business enterprise ("MBE") that has done business with defendant as a prime contractor, subcontractor, and joint venture contractor since 1987. The instant case arises out of defendant's decision not to award two custodial contracts to plaintiff.

On January 31, 2000[2], defendant's Office of the Inspector General ("OIG") interviewed

---

[2]The court notes that throughout its L.R. 56.1 statement defendant refers to the interview taking place on March 26, 2000, and Richard Slingerland ("Slingerland"), who interviewed Blackstone, states in an affidavit that the interviewed occurred on March 26, 2000. The OIG memorandum, co-authored by Slingerland, which describes the interview, however, is dated

(continued...)

Blackstone as part of defendant's review of its milk contract with Nick's Dairy Service ("Nick's"). Plaintiff had participated in the milk contract as a prime contractor and an MBE sub-vendor for Nick's. According to a memo dated January 31, 2000, and prepared by the two OIG investigators who interviewed Blackstone, Blackstone stated that his company is not a dairy, he has no milk delivery trucks, no milk drivers, and no storage facilities, and his company does not produce or process milk.

On July 14, 2000, the OIG issued a memorandum identifying a "contractual loophole" in defendant's milk contracts that permitted some vendors "to supply milk at an inflated price." In the contracts, the bid price for 1% milk was not included in the calculation of the bid award, but defendant reserved the right to change from 2% milk to1% milk during the contract period. Nick's and plaintiff bid between five and six cents more per carton of 1% milk than 2% milk. The OIG's July 14 memo states, "A preliminary review of 150 invoices indicates that the two companies [Nick's and plaintiff] now may be taking advantage of the bid provision described above by substituting large amounts of the higher price 1% milk for 2% milk."

On May 26, 2004, in response to an issue that arose during a briefing prior to the May 26, 2006, Board meeting, Ellen Daley ("Daley"), senior assistant general counsel for defendant, wrote a memo to file. Daley stated that the OIG's investigation of the milk contracts "was not able to substantiate any wrongdoing" by plaintiff because "required documentation was never received by the OIG, and Blackstone refused to sign a statement."

---

[2](...continued)
January 31, 2000. Plaintiff's L.R. 56.1 statement also states that Blackstone was interviewed on January 31, 2000.

During 2003 and 2004, the OIG conducted an investigation of an allegation that Preferred Meals Systems, Inc. ("Preferred") had failed to comply with a provision in its contracts with defendant that Preferred subcontract with certified African-American owned business enterprises that performed "a commercially independent function with a participation goal of 16% of the value of the contracts." The OIG wrote a memo dated April 23, 2004, stating that Preferred originally identified plaintiff as an African-American participant, but that this relationship ended in March 2001, and T & T Foodservices, Inc. ("T&T") became a subcontractor for Preferred. During the OIG investigation of Preferred, the president of T&T stated to OIG investigators that, "Preferred offered T&T the same deal that Preferred had with [plaintiff] which meant that T&T would be paid for doing very little," and that, "Preferred officials made it clear that they have been willing to make payments to T&T and not require anything in return."

On September 17, 2003, defendant issued and advertised an RFP to "provide professional custodian management services" for defendant, RFP number 03-250080 (the "2003 RFP"). Defendant classified the 2003 RFP as for "professional services," which exempted it from the competitive bidding statute applied to contracts between defendant and private vendors.[3] Plaintiff timely submitted a proposal in response to the 2003 RFP. On March 15, 2004, defendant's "Professional Custodial Management Team" submitted a memorandum to Murphy and Obora that provided an analysis of all offers received in response to the 2003 RFP.

---

[3]105 ILCS 5/10-20.21, which is part of the Schools Code, requires defendant, "To award all contracts for purchases of supplies, materials or work or contracts with private carriers for transportation of pupils involving an expenditure in excess of $10,000 to the lowest responsible bidder, considering conformity with specifications, terms of delivery, quality and serviceability, after due advertisement except the following: (i) contracts for the services of individuals possessing a high degree of professional skill where the ability or fitness of the individual plays an important part... ."

According to the March 15 memorandum, plaintiff was one of eight vendors selected for an interview based on "their responsive and responsible submittals and pricing."

A President's briefing[4] for the May 26, 2004, Board meeting was held on May19, 2004. Murphy, Obora, and Michael Scott ("Scott"), president of defendant, were present at the President's briefing. Murphy presented the May 15, 2004, report regarding contract awards under the 2003 RFP. Murphy testified that Scott recognized plaintiff's name and asked if Murphy was aware of any past issues regarding plaintiff. Murphy responded that he was not then aware of any issues, but that he would look into whether there were any issues outstanding that had been missed during the RFP process. Obora also testified that Scott asked a question about plaintiff at the May 19, 2004, meeting. Obora stated that she understood Scott to be "asking why [plaintiff] was on the custodial management, professional custodial management Board report." After the May 19, 2004, President's briefing, Murphy investigated defendant's past business interactions with plaintiff and reviewed documents from the OIG, including those regarding the investigations into Preferred and the milk contracts. Murphy stated that although nothing had been substantiated against plaintiff, he was concerned that plaintiff was engaging in inappropriate activities and was not appropriate for the 2003 RFP award.

On May 26, 2004, Obora, Arne Duncan, defendant's chief executive officer, John Maiorca ("Maiorca"), defendant's chief financial officer, and Ruth Moscovitch ("Moscovitch"), defendant's general counsel, signed a Board report titled, "Approve Entering Into Agreements with Various Vendors to Provide Professional Custodian Management Services." The document

---

[4]Defendant does not explain a "President's briefing," although it appears that it is a monthly meeting of Board members and the president of the Board at which Board reports are discussed by department heads and others.

lists four vendors awarded the 2003 RFP contracts: (1) plaintiff; (2) A & R Janitorial Services, Inc.; (3) Total Facility Maintenance; and (4) We Clean Maintenance & Supplies, Inc. Murphy testified that this Board report was a draft only, and the signatures indicated that it was approved for consideration by Murphy as CPO.

During the May 26, 2004, closed-session meeting of the Board, Murphy exchanged several e-mails via his Blackberry to Lynne Moore ("Moore"), defendant's director of facility maintenance and department of operations, concerning plaintiff. Moore wrote to Murphy that the law department had "OK'd" plaintiff. Moore subsequently wrote that Daley, assistant general counsel for defendant, felt that even through the OIG claims were unsubstantiated and plaintiff was never disbarred, plaintiff was "shady" and that if defendant awarded it a contract, "OIG would for sure investigate and dig for dirt!" Murphy responded to Moore, "O.K. Stay with the original plan. That e-mail was exactly what I needed. Thank you!" Murphy testified at his deposition that the "original plan" was to eliminate plaintiff from the 2003 RFP contracts during the closed session. Murphy then communicated to Obora that he was "moving forward with three [vendors]," which did not include plaintiff. Murphy did not recall any discussion during the May 26, 2004, meeting about this decision, but admitted that he referred to "transgressions" by plaintiff.

On May 26, 2004, Obora, Maiorca, Moscovitch, and Duncan signed a Board report titled "Approve Entering Into Agreements with Various Vendors to Provide Professional Custodian Management Services." The document lists three vendors awarded the 2003 RFP contracts: (1) A & R Janitorial Services, Inc.; (2) Total Facility Maintenance; and (3) We Clean Maintenance & Supplies, Inc. Plaintiff was not included and was not awarded a contract under the 2003 RFP.

On June 3, 2004, defendant's procurement department wrote a memorandum to file regarding the 2003 RFP, stating that "[plaintiff] had been recommended by the Evaluation Team for contract award, however, Procurement and Contracts has been directed by the Board Office, citing a memo from the [OIG], to remove [plaintiff] from consideration for award." The memo referred to the OIG's March 28, 2001, memo as the reason for the plaintiff's removal from consideration. On June 11, 2004, defendant sent plaintiff a letter signed by Obora stating that plaintiff's "submittal is no longer under consideration" for the 2003 RFP. The letter also stated, "While your company was not selected for this program, [defendant] appreciates your interest and encourages you to continue your participation in the RFP process." The letter did not state that plaintiff had been found to be non-responsible.

On June 30, 2004, Benjamin Ho ("Ho"), in defendant's procurement and contracts department, advised plaintiff that it was entitled to a debriefing to learn the reason that it was not awarded a contract under the 2003 RFP. On July 1, 2004, Doris Williams ("Williams"), director of operations and maintenance for defendant, sent plaintiff an e-mail stating that Williams would be facilitating the debriefing plaintiff requested. Less than a week later, Williams advised plaintiff the debriefing was cancelled. Obora was Ho and Williams's supervisor at the time. Obora testified that she was on maternity leave at the time, and did not understand why her staff believed a debriefing was necessary because her office "did not have to hold debriefing meetings with vendors after awards of RFPs."[5]

---

[5]The court notes that defendant cites to pages 34 through 36 of Obora's deposition in support of this statement, but these pages are not attached to defendant's L.R. 56.1 statement.

On April 7, 2004, defendant issued RFP 04-250028 for "Professional Custodian Management Services at 125 S. Clark Street, Chicago, Illinois" ("2004 RFP"). Defendant classified the 2004 RFP as a "professional custodial management services contract." The scope of work under the 2004 RFP and requirements regarding management services and staff were substantially similar to the 2003 RFP. On April 28, 2004, plaintiff submitted a bid in response to the 2004 RFP, which was substantially similar to its proposal under the 2003 RFP. On June 3, 2004, defendant's procurement department wrote a memorandum to file stating that plaintiff had been deemed non-responsible for the 2004 RFP based on the OIG's March 28, 2001, memo and that plaintiff had been removed from consideration for the award. Obora testified that as CPO she had the authority to deem any vendor not responsible without going through a formal proceeding with the Board, and that she deemed plaintiff non-responsible prior to June 4, 2004.

On June 30, 2004, the evaluation team for the 2004 RFP wrote a memorandum to Murphy and Obora regarding the scoring of offers received under the 2004 RFP. According to the memo, plaintiff was the lowest priced offeror for both years of the contract. The June 30 memo also states that the evaluation team was told that plaintiff was "to be removed from contention for any awards" with defendant, and that the CPO deemed plaintiff non-responsible based on the OIG's March 28, 2001, memo. On October 1, 2004, defendant sent plaintiff a letter stating that its "submittal is no longer under consideration" on the 2004 RFP. The letter also stated, "While your company was not selected for this program, [defendant] appreciates your interest and encourages you to continue your participation in the RFP process." The letter did not state that plaintiff had been found to be non-responsible. Plaintiff has not performed any

work for defendant or been awarded any new contracts since it was not awarded contracts under the 2003 RFP and the 2004 RFP.

Defendant's "Debarment Policy on Non-Responsible Persons in Procurement Transactions," section 401.6 of Chicago Public Schools' Policy Manual ("Debarment Policy"), provides a detailed statement of the due process defendant provides vendors who are "debarred." The Debarment Policy states, "Debarment is a serious action which may lead to the person being excluded from procurement transactions with [defendant] for a period of up to three years." The Debarment Policy also provides that, "Persons who are debarred from participation in Board transactions shall be placed on a list of debarred participants, which list shall be disseminated."

## SUMMARY JUDGMENT STANDARD

A movant is entitled to summary judgment under Rule 56 when the moving papers and affidavits show there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Unterreiner v. Volkswagen of America, Inc., 8 F.3d 1206, 1209 (7th Cir. 1993). Once a moving party has met its burden, the nonmoving party must go beyond the pleadings and set forth specific facts showing there is a genuine issue for trial. See Fed. R. Civ. P. 56(e); Becker v. Tenenbaum-Hill Associates, Inc., 914 F.2d 107, 110 (7th Cir. 1990). The court considers the record as a whole and draws all reasonable inferences in the light most favorable to the party opposing the motion. See Fisher v. Transco Services-Milwaukee, Inc., 979 F.2d 1239, 1242 (7th Cir. 1992).

A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242,

248 (1986); Stewart v. McGinnis, 5 F.3d 1031, 1033 (7th Cir. 1993).  However, the nonmoving

party "must do more than simply show that there is some metaphysical doubt as to the material

facts."  Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  "The

mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be

insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving

party]."  Anderson, 477 U.S. at 252.

**DISCUSSION**

**I.      Due process (Count I)**

In Count I of its second amended complaint, plaintiff asserts that defendant is liable

under 42 U.S.C. § 1983 for violating its due process rights under the Fifth and Fourteenth

Amendments by "arbitrarily and capriciously rescinding" the 2003 RFP award.  Plaintiff alleges

that the rescission of the contract amounts to a "de facto debarment" without due process of law.

According to plaintiff, defendant's actions have deprived it "of a liberty interest in its reputation

for integrity and responsibility, together with its continued right to employment on contracts with

[defendant]."  Plaintiff asserts that defendant's denial of an award to plaintiff under the 2004

RFP is further evidence of an unlawful official policy and practice toward plaintiff.  Defendant

argues that plaintiff cannot establish a liberty interest, which is a required element of a due

process claim, because plaintiff fails to demonstrate that it was stigmatized by defendant's

alleged actions or that it suffered a tangible loss.

The Seventh Circuit employs a two-step process to analyze a due process claim.  A court

must first determine whether the plaintiff has been deprived of a protected interest, and then

determine what process is due.  Sonnleitner v. York, 304 F.3d 704, 711 (7th Cir. 2002);

Townsend v. Vallas, 256 F.3d 661, 673 (7th Cir. 2001). Relevant to the instant case, "[a] liberty interest under the Fourteenth Amendment is implicated when either the individual's good name, reputation, honor or integrity is at stake because of what the government is doing to him or the government has imposed upon him a stigma or other disability that forecloses his freedom to take advantage of other employment opportunities." Mitchell v. Glover, 996 F.2d 164, 167 (7th Cir.1993) (citing Board of Regents v. Roth, 408 U.S. 564, 573 (1972)). A plaintiff must show that: (1) it was stigmatized by defendant's conduct; (2) the stigmatizing information was publicly disclosed; and (3) it suffered a tangible loss of other employment opportunities as a result of public disclosure. Burke v. Chicago School Reform Board of Trustees, 169 F. Supp. 2d 843, 847 (N.D.Ill. 2001). Put another way, a plaintiff must establish "defamation plus" loss of employment opportunities. Davis v. City of Chicago, 53 F.3d 801, 804 (7th Cir. 1995).

In the instant case, defendant agues that plaintiff fails to create a triable issue of material fact regarding either the second or third element of a protected liberty interest. First, defendant asserts that no stigmatizing information about plaintiff was made public because neither the May 19, 2004, President's briefing nor the May 26, 2004, closed Board meeting was open to the public. In addition, plaintiff presents no evidence that the first version of the May 26, 2004, Board report listing plaintiff as a vendor under the 2003 RFP was made public. Second, defendant argues that plaintiff did not suffer a tangible loss of other employment opportunities because it was not debarred, and therefore remains eligible to submit proposals in response to future RFP's issued by defendant.

In support of its argument that it was publically stigmatized, plaintiff points to Murphy's statement during defendant's May 26, 2004, Board meeting that plaintiff "had committed

'transgressions' in its past performance with [defendant.]" Plaintiff, however, describes this meeting as a "closed session," without explaining how a closed session can be considered public, and cites no authority in support of this suggestion. Plaintiff relies heavily on <u>A.F.C. Enterprises, Inc. v. New York City School Construction Authority</u>, 1999 WL 1417210, at * 12 (E.D.N.Y. June 29, 1999), in which a district court for the Eastern District of New York held that the plaintiff had sufficiently alleged the "stigma" element of a due process claim. The plaintiff in <u>A.F.C.</u> alleged that following a dispute over a contract to perform construction work at a public school the defendants caused the plaintiff to be listed as non-responsible in a database that all contracting officers for city agencies were required to consult before awarding any contracts. <u>Id.</u> at *3. In addition, the defendants allegedly wrote letters to the city comptroller, who had final approval over all city contracts, reciting at least eighteen instances of serious misconduct regarding a prior city contract. <u>Id.</u> at *3. According to the plaintiff's complaint the letters charged that the plaintiff had improperly installed the plumbing, electrical, heating, ventilation and other major systems, walked off the job and failed to return, and affirmatively misrepresented the status of several integral building components, including the results of a fire safety test. <u>Id.</u> at *12. The <u>A.F.C.</u> court stated that taken together, these statements "allege at the least gross professional incompetence," and some "impugn [the plaintiff's] honesty and integrity." <u>Id.</u> at *12. The court held that if proven, these disclosures would impose a "tangible burden" on the plaintiff's ability to seek future city and municipal contracting awards. <u>Id.</u> at *12.

<u>A.F.C.</u> is distinguishable from the instant case on several grounds, not least of which is that the court denied the defendants' motion for judgment on the pleadings, not summary

judgment.  Defendant's statements and actions here do not even approach the level of severity as those in <u>A.F.C.</u>  Repeated, plain-vanilla statements in several internal memoranda that a vendor has been deemed non-responsible and Murphy's vague comment about "transgressions" is a far-cry from the detailed and facially reprehensible accusations that the defendants in <u>A.F.C.</u> allegedly levied against the plaintiff in that case.  Moreover, plaintiff here admits that Murphy's statement on May 26 was made in a "closed session," and does not argue that defendant's closed meetings are attended by representatives of other city agencies, or that the defendant's decision not to award contracts to plaintiff was known to other agencies.  Likewise, plaintiff does not assert that any of the memoranda, which are addressed "to file" or to defendant's executives, were disseminated to or accessed by anyone outside of defendant's procurement and purchasing departments and its executive staff.

Defendant's argument that plaintiff was not publicly stigmatized is supported by <u>Mitchell v. Glover</u>, 996 F.2d 164 (7th Cir. 1993), in which the Seventh Circuit affirmed summary judgment in favor of the defendant because the plaintiff failed to present evidence that his former employer disseminated negative information about him.  The plaintiff in <u>Mitchell</u> was informed that he was terminated from his position as a college registrar in a private meeting with the college president.  <u>Id.</u> at 166.  At a faculty meeting attended by approximately 90 faculty members, the president was confronted by a union leader who asked whether certain faculty members had been barred from campus.  <u>Id.</u>  The president responded that the plaintiff was the only person who had been barred, and then refused to further discuss the plaintiff's termination. <u>Id</u>.  The Seventh Circuit held that the plaintiff had failed to create a triable issue of material fact

that he had been publicly stigmatized, and thus could not establish that he was denied a liberty interest. Id. at 168.

In Burke, the court held that the plaintiff, a teacher, had sufficiently pled loss of a liberty interest where she was accused of fabricating or even causing sex crimes between students on school premises, attendance book fraud, and stealing her grade book. 169 F. Supp. 2d at 847-848. The court noted the plaintiff had made a threshold showing that these serious, even criminal charges had been publicly disclosed by alleging that she was given negative job references. Id. at 848. Plaintiff cites Doyle v. Camelot Care Centers, Inc., 305 F.3d 603 (7th Cir. 2002), in support of its argument that its liberty interest was impugned by public stigma, but as with Burke, the ready distinctions between Doyle and the instant case undermine plaintiff's arguments. In Doyle, the defendants, officials of the Illinois Department of Children and Family Services, "indicated" the plaintiff for medical neglect of a child in her care, recorded their determination in a state-wide registry, and disclosed their findings to plaintiff's employer, which resulted in her termination. 305 F.3d at 608.

In the instant case, defendant's comments about plaintiff do not begin to approach the stigmatizing accusations in A.F.C., Doyle, or Burke, and like the plaintiff in Mitchell, plaintiff here has failed to raise a triable issue of fact that the comments were publicly disclosed by defendant. Plaintiff does not directly address defendant's public disclosure argument, focusing instead on the alleged unfairness of defendant's decision not to award the 2003 RFP and the alleged denial of plaintiff's due process rights. Plaintiff, however, has skipped a vital step. It is well-established that due process requirements are triggered only after a plaintiff has established the denial of a liberty or due process interest. See Sonnleitner, 304 F.3d 704. Plaintiff has failed

to create a triable issue of fact that the allegedly stigmatizing statements and conduct of defendant were publicly disseminated, and has thus failed to establish a liberty interest.

Even if plaintiff had established that it was publicly stigmatized, it has failed to establish that it suffered a tangible loss of employment, which is the third required element of its due process claim. Plaintiff asserts that not receiving a contract under the 2003 RFP or the 2004 RFP constitutes a tangible loss, but plaintiff does not assert that it has been barred from an industry or field by defendant's actions. The Seventh Circuit noted in Lawson v. Sheriff of Tippecanoe County, Inc., 725 F.2d 1136, 1138 (7th Cir. 1984), that a plaintiff's liberty interest is denied when a state excludes her from a "trade or calling," not merely when she is denied a particular job. In the instant case, plaintiff does not identify a particular trade or calling. From the record, it appears that plaintiff is quite versatile, indeed; it has supplied defendant with products and services ranging from custodians to milk cartons. More significantly, plaintiff has failed to point to any evidence that it has been barred from pursuing its desired field.

Again, a comparison of the instant case with A.F.C. highlights the deficiencies in plaintiff's claim. The plaintiff in A.F.C. was placed in a database that all city agencies were required to consult, and the defendants publicized odious accusations against the plaintiff to the city comptroller, who had the ability to refuse to register any city contract. A.F.C., 1999 WL 1417210 at *13. Because the plaintiff in A.F.C. alleged that it had been publicly stigmatized and "blacklisted" from future work on all city contracts, the court held that it had sufficiently alleged that it had been de facto debarred in violation of its due process rights. Id. In the instant case, defendant argues that plaintiff was not even barred from performing future work with defendant, but merely deemed not responsible on two individual contacts. Even accepting plaintiff's

version of the evidence, it suggests, at worst, that its ability to obtain contracts with defendant - but not other agencies - was harmed. Plaintiff has thus failed to establish a triable issue of material fact that it has suffered a tangible loss of other employment due to defendant's actions.

The relentless refrain of plaintiff's briefs is that like the plaintiff in <u>A.F.C.</u> it was de facto debarred by defendant. Even if it is a disputed question of fact whether plaintiff was de facto debarred without the process established in the Debarment Policy, it is not material because plaintiff has failed to demonstrate on the facts in this record that such de facto debarment resulted in a loss of a liberty interest. A violation of defendant's internal policies, absent evidence of the elements of a due process claim including public stigma and a tangible loss, does not violate the Constitution. Plaintiff fails to present evidence that it was subject to provisions of the Debarment Policy that may compromise a vendor's liberty interest. For example, plaintiff presents no evidence that its name was included on a list of debarred participants that is disseminated under the Debarment Policy. In addition, in support of its assertion that it has been excluded from all procurement transactions for a period of time, which defendant is authorized to do to vendors under the Debarment Policy, plaintiff points to the denial of two contracts only. Plaintiff has failed to show that the result of its alleged de facto debarment is analogous to the debarment alleged in <u>A.F.C.</u> or otherwise constitutes a due process violation.

Accordingly, the court grants defendant's motion for summary judgment, and denies plaintiff's cross motion for summary judgment on Count I.

## II.     Bidding statute (Count II)

In Count II of its second amended complaint, plaintiff seeks a declaratory judgment that the contracts solicited by defendant under the 2003 RFP and the 2004 RFP (collectively, the

"Custodian RFPs") were not for "professional services" and therefore not exempt from the competitive bidding statute, section 10-20.21 of the School Code, 105 ILCS 5/10-20.21. Plaintiff argues that the Custodian RFPs were mislabeled because they do not involve work that requires a professional license or expertise. Defendant responds that the custodial contracts required management skills and managers, as clearly laid out in the Custodian RFPs, which required proposals to include a management fee and the resumes of the management staff.

Plaintiff argues that "janitorial services, whether they are labeled as 'professional' or not, do not fall within the statutory exception to the competitive bidding statute." Plaintiff relies primarily on O'Hare Express, Inc. v. City of Chicago, 235 Ill. App. 3d 202 (1st Dist. 1992), which held that a contract to provide shuttle bus services within the O'Hare Airport terminal did not qualify for the professional services exemption because there was no evidence in the record that the services required a "particular degree of professional skill." Id. at 210. A deputy commissioner of aviation testified on behalf on the defendant that the contractor must respond adequately to extreme time pressures created by an increasing volume of traffic and changing flight schedules, and that the defendant was dissatisfied with the past performance of the plaintiff. Id. at 210. The defendant's chief purchasing officer also testified that the shuttle-bus service required the "most qualified" and "most capable" contractor, and that such quality control could not be assured through competitive bidding. Id. The O'Hare court held that this testimony was insufficient to establish that a contract for the transportation of passengers along the same, approximately mile-long route within the airport was a contract for "professional services." Id.

Shortly after O'Hare, Compass Health Care Plans v. Board of Education of the City of Chicago, 246 Ill. App. 3d 746 (1st Dist. 1992), held that a contract for a health-maintenance organization ("HMO") to provide medical benefits to employees of the school system was not exempt from the competitive bidding statute under 105 ILCS 5/10-20.21(i), the same statute that defendant raises in the instant case. Id. at 751-52. The Compass court rejected the defendant's argument that the contracts were not adapted to award by competitive bidding because they were health care contracts that involve the services of individuals, namely medical care providers, possessing a high degree of professional skill. Id. at 749. The court agreed with the trial court that none of the contract activities, which were largely administrative, required professional medical training. Id. at 750.

Both O'Hare and Compass support plaintiff's argument in the instant case. Murphy, who was the CPO when the 2003 RFP was issued, testified that defendant characterized the 2003 RFP as being for professional services because it had experienced problems with multiple vendors in the past, and defendant believed that "a higher level of management oversight was needed" to meet the "detailed performance standard." Murphy's testimony that he determined that the 2003 RFP, unlike previous custodial contracts, would be characterized as for "professional services" is similar to the testimony of the CPO in O'Hare, which the court rejected as insufficient. The fact that the Custodian RFPs involved a large number of buildings, including public schools and employees, and required compliance with defendant's performance standards, is also similar to the evidence found lacking in O'Hare. Unlike the contract in Compass, which was related to professional services (medical care), defendant in the instant case has failed to identified any professional services involved in the Custodian RFPs. Defendant attempts to distinguish

Compass because the contracts in that case were awarded based on the number of enrollees in each of the HMO plans, but this argument fails to recognize that the types of services provided by the HMOs, essentially the administration of medical services, were found not to be professional services.

Defendant argues that it correctly issued the Custodian RFPs rather than a bid solicitation because they "sought proposals for specific professional management services skills in addition to provision of labor." Defendant points to the contractors' duties under the Custodian RFPs to provide training, oversight, and "financial services," which defendant do not identify. Defendant does not, however, provide any case law in support of its argument that a management, supervisory, or training component automatically converts what is essentially a labor contract into one for professional services. To accept defendant's argument would allow the narrow exemption in section 10-20.21 to swallow the general rule and the legislature's clear intent that defendant engage in competitive bidding for all contracts, unless a specific exemption applies.

In support of its argument, defendant cites several Illinois Appellate Court cases, but each is distinguishable. In <u>Hassert Storage v. Board of Election Commissioners</u>, 69 Ill. App. 3d 972 (1st Dist. 1979), the plaintiff alleged that the defendant failed to comply with the competitive bidding statute requirements in granting a contract for the storage and cartage of election equipment. First, the defendant in <u>Hassert</u> admitted that the contract required a high degree of professional skill. <u>Id.</u> at 982. In addition, the <u>Hassert</u> court held that the contract was properly exempted from the statute because it placed an extraordinary responsibility on the contractor for the efficient administration of the electoral process, required that trust and confidence be placed in the performer of the contract, and required near perfect performance under extreme time

pressures.  Id.  The Hassert court also noted that the performance of the contract directly

impacted the integrity of elections and guarded against disenfranchisement of voters.  Id.

Plaintiff in the instant case do not admit that the Custodian RFPs involved professional services,

and defendant has failed to present any evidence that the Custodian RFPs demanded an

analogous level of perfection under comparable time pressures, or that individuals' constitutional

rights were at stake.  See O'Hare, 235 Ill. App. 3d at 210 (distinguishing Hassert on similar

grounds).

Defendant also cites Shivley v. Beleville Township High School Dist. No. 201, 329 Ill.

App. 3d 1156 (5th Dist. 2002), which held that the professional-services exemption applied to a

construction manager's contract.  The Shivley court noted that the construction manager's duties

and obligations under his contract with the school district went well beyond those that were

normally provided by a general contractor, where the construction manager was hired to serve as

an advisor and consultant and was vested with considerable discretion in managing the project.

Id. at 1168-69.  The services rendered under the Custodian RFPs do not begin to approach the

analytical skills and independent judgment required of the construction manager in Shivley.

Defendant's citation of American Health Care Providers v. County of Cook, 265 Ill. App.

3d 919 (1st Dist. 1994), is also unhelpful.  First, the competitive bidding issue in American

Health was decided under the home rule doctrine, which is not applicable here.  Second, in

discussing the plaintiff's "supplementary argument" that the contracts at issue were not

professional services and affirming the lower courts dismissal of the complaint, the court noted

that the contract involved "myriad insurance coverages and types of direct service provisions" in

multiple permutations.  Id. at *932.  In the instant case, defendant has failed to raise a triable

issue of material fact that the Custodian RFPs involved analogous complications or other features that would qualify them as for professional services.

Simply put, while keeping the schools well-maintained and clean is important to defendant's mission, merely requiring that these rather pedestrian services be performed well and managed ably cannot elevate them to the level of professional skill required by the exemption to the competitive bidding statute. 105 ILCS 5/10-20.21. Accordingly, the court grants plaintiff's motion for summary judgment, and denies defendant's motion for summary on Count II.

The court notes, however, that the declaration that the Custodian RFPs should have been let under the competitive bidding statute may be a pyrrhic victory because the court cannot grant plaintiff the remedy it seeks. Although neither party addresses remedy in its briefs, plaintiff's prayer for relief in its second amended complaint seeks a preliminary and permanent injunction directing defendant to award plaintiff the Custodian RFPs. Plaintiff does not seek damages under Count II.[6] The court cannot award the contracts to plaintiff, however, because the record does not establish and plaintiff does not argue that plaintiff would have been the lowest bidder had the contracts been bid on competitively.

Defendant asserts that "under either type of competitive solicitation, [plaintiff] was not a responsible bidder." The court notes that neither party explains the competitive bidding process,

---

[6]Lost profits are not recoverable by an unsuccessful bidder for a public contract in a state law breach of contract claim. Keefe-Shea Joint Venture v. City of Evanston, 332 Ill. App. 3d 163, 177 (1st Dist. 2002) (citing Court Street Steak House, Inc. v. Country of Tazewell, 163 Ill.2d 159, 169-70; Bodine Electric of Champaign v. City of Champaign, 305 Ill. App. 3d 431 (1999)). Illinois law does permit an action to recover the cost of preparing a bid. State Mech. Cont. v. Pleasant Hill, 132 Ill. App. 3d 1027, 1032 (4th Dist. 1985).

or sufficiently details the regulatory and case law limitations on an agency's ability to exercise its discretion under the RFP process.  In supports of its argument that plaintiff was non-responsible, defendant cites Court Street Steak House, Inc. v. County of Tazewell, 163 Ill.2d 159, 165 (1994), which holds that "a public body exercises a great deal of discretion in determining the lowest responsible bidder."  As evidence that plaintiff was non-responsible, defendant points to the March 28, 2001, memo from the OIG, and the testimony of Murphy and Obora that they deemed plaintiff non-responsible as the CPO.  Plaintiff vigorously contends that defendant had "no basis" to find it non-responsible, but fails to cite a single case addressing the standards applicable to a finding of non-responsibility or the appropriate remedy for a mistaken determination.  Even assuming that the custodial contracts were let under the competitive bidding statute and plaintiff were deemed responsible, the record does not establish that plaintiff would have been the lowest bidder among hypothetical competitive bids.  It seems entirely possible that certain vendors who chose not to participate in the RFP process might have responded to a call for competitive bids.

In the instant case, unlike many others in which courts addressed competitive bidding statutes, including Keefe-Shea Joint Venture v. City of Evanston, 332 Ill. App. 3d 163 (1st Dist. 2002), plaintiff did not seek a preliminary injunction or temporary restraining order.  Instead, plaintiff waited until the contracts had been awarded to and at least partially performed by others to challenge the process under which proposals were solicited.  Plaintiff fails to offer any persuasive reason to justify how an injunction can be granted awarding a near-completed contract to another vendor based on speculation about what would have occurred under a different process and with potentially different vendors vying for the contracts.  In particular,

plaintiff does not explain how the court could remove the current vendor, which has not been joined as a party in this case, from the 2003 RFP, which expires in June 2006.

Accordingly, the court grants plaintiff's motion for summary judgment on Count II, and declares that the Custodial RFPs were not exempt from competitive bidding under 105 ILCS 5/10-20.21. The court declines to award further relief to plaintiff on Count II.

### III.     Equal protection (Count III)

Count III of plaintiff's second amended complaint asserts that defendant is liable under 42 U.S.C. § 1983 for violating its equal protection rights under the Fifth and Fourteenth Amendments by treating plaintiff differently than other contractors that were found to have acted improperly or that were subject to the same type of investigation by the OIG as plaintiff.

Plaintiff asserts that it constitutes a "class of one." The Supreme Court has recognized a "class of one" claim, where a claim may be sufficient if the plaintiff alleges that he has been intentionally treated differently from others similarly situated and there is no rational basis for the different treatment. Village of Willowbrook v. Olech, 528 U.S. 562 (2000). The Seventh Circuit has held that a class of one equal protection claim is established where the defendant has intentionally treated the plaintiff differently that others similarly situated either without any rational basis for doing so or out of some "totally illegitimate animus." See Lunini v. Grayeb, 395 F.3d 761, 768 (7th Cir. 2005); Albiero v. City of Kankakee, 246 F.3d 927, 932 (7th Cir. 2001).[7] Plaintiff in the instant case argues that defendant's refusal to award plaintiff contracts

---

[7]The court notes that the Seventh Circuit recently recognized a "tension" between its class of one jurisprudence and the Supreme Court's holding in Olech. Racine Charter One, Inc. v. Racine Unified School District, 424 F.3d 677, 683-84 (7th Cir. 2005). The Racine court noted that in addition to one line of cases, including Lunini and Albiero, a separate line of cases holds

(continued...)

under the Custodian RFPs was "wholly arbitrary," and thus attempts to establish an equal

protection violation under the first method.[8]

Plaintiff devotes an inordinate amount of time in its L.R. 56.1 statement and its briefs to

discussing other vendors who have been awarded contracts with defendant, including the

custodial contracts. Plaintiff essentially argues that because it has been unfairly singled out,

even if the concerns about its past improprieties were true, the other vendors are guilty of equal

or greater misconduct. Plaintiff is so fixated on the alleged misconduct of its competitors that it

fails to address whether the several legitimate state objectives offered by defendant as

justifications for its decision form a rational basis for defendant's decision.

Under the rational basis test, the court "will uphold the legislative enactment (or

classification) so long as it bears a rational relation to some legitimate end." Eby-Brown Co.,

LLC v. Wis. Dep't of Agric., Trade & Consumer Prot., 295 F.3d 749, 754 (7th Cir. 2002). This

inquiry requires the court to "consider only whether any state of facts reasonably may be

conceived to justify the classification." Rabbi Abraham Grossbaum and Lubavitch of Indiana,

Inc. v. Indianapolis-Marion County Bldg. Auth., 100 F.3d 1287, 1292 (7th Cir. 1996).

Defendant argues that its decision to remove plaintiff from contention for the Custodian

RFPs was based on several public interest concerns, including the importance of public

---

[7](...continued)
that the mere absence of a rational basis is not enough to sustain the class of one, and that instead
the plaintiff must prove illegitimate animus to succeed. Racine, 424 F.3d at 684 (collecting
cases). Like the Racine court, however, this court need not decide this issue because plaintiff in
the instant case has failed to establish either a lack of rational basis or illegitimate animus.

[8]Plaintiff cites cases in which the plaintiff alleged illegitimate animus or a vindictive
campaign, including Esmail v. Macrane, 53 F.3d 176 (7th Cir. 1995), but plaintiff does not allege
similar animus here.

confidence in the government contracting process, the need for honest and conscientious private contractors, particularly in public schools, and an interest in engaging the services only of vendors that it believes are capable and responsible. Murphy and Obora, successive CPOs with ultimate approval power over vendor contracts, both testified that although they recognized that the OIG investigation into the milk contracts had been unable to substantiate any charges against plaintiff, there had been reason to suspect wrongdoing. In addition, plaintiff had been implicated, although not charged or penalized, in a later investigation of misconduct involving the Preferred contract. Murphy testified that the OIG documents identified "some activities that I did not believe were appropriate," including the appearance that plaintiff was a minority pass-through and was charging inflated prices on another school contract. Murphy stated that "the numbers of instances had me believing that it would not be a good idea to move forward with [plaintiff] then" because it could "ultimately cause more problems." Obora also testified that she had concerns about plaintiff's expertise in janitorial services since it had previously performed milk and meals contracts. According to Obora, given this history, she felt it was "questionable as to what the true service is" that plaintiff was providing.

Plaintiff has failed to raise a triable issue of material fact that based on the information available to the CPOs and the Board at the time they made the decisions at issue, or that defendant's finding that plaintiff was non-responsible for two particular contracts was "wholly unrelated to any legitimate state objective." Accordingly, the court grants defendant's motion for summary judgment on Count III.

**IV.     Motion to strike Blackstone affidavit**

Defendant filed a motion to strike the affidavit of Ronald Blackstone, president of plaintiff, or, in the alternative, to strike the portions of plaintiff's L.R. 56.1 statement that rely on Blackstone's testimony. Because the court grants defendant's motion for summary judgment as to Counts I and III, and did not consider any of Blackstone's affidavit testimony in deciding Count II, defendant's motion is denied as moot.

## CONCLUSION

For the reasons stated herein, the court grants defendant Chicago Board of Education's motion for summary judgment on Counts I and III, and grants plaintiff RJB's motion for declaratory judgment on Count II declaring that the Custodial RFPs were not exempt from competitive bidding under 105 ILCS 5/10-20.21.

**ENTER:** **January 24, 2006**

_____
**Robert W. Gettleman**
**United States District Judge**